UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| LYN WHEELER KINYON, | § | |
| Plaintiff | § | |
| | § | CIVIL ACTION NO. 6:17-cv-00023RP |
| VS. | § | |
| | § | |
| BAYLOR UNIVERSITY, | § | |
| Defendant | § | |

## PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND

To the Honorable Court: Lyn Wheeler Kinyon files her amended complaint and jury demand complaining of Baylor University. Defendant filed its Waiver of Service of Summons on January 25, 2017, and this pleading is filed as a matter of course within 21 days of serving the original complaint, pursuant to Rule 15 (a)(1)(A), FRCP.

### A. Nature of Action

1. This is a Title IX retaliation case brought pursuant to the implied private right of action principles announced by the Supreme Court in *Jackson v. Birmingham Board Of Education*, 544 U.S. 167, 176-78 (2005). Plaintiff's employment was terminated because she opposed Baylor University's unlawful practices which were in violation of Title IX of the Education Amendments of 1972, 20 USC, §1681(a), a statute designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.

2. As an advisory to the Court, Plaintiff has filed a charge of age discrimination with the United States Equal Employment Opportunity Commission (EEOC) and the Texas Workforce Commission – Civil Rights Division (TWC-CRD) under the AGE DISCRIMINATION IN

EMPLOYMENT ACT, 29 USC, §621 *et seq.* and Texas LABOR CODE, §21.051 against Baylor University arising out of the same facts alleged in this petition. Upon exhaustion of her administrative remedies for age discrimination and receipt of right to sue letters, Plaintiff will, unless all her claims have been resolved, seek leave of court to amend this complaint adding a claim for age discrimination remedies.

### B. Parties

3. Plaintiff is the former Assistant Vice President for Student Financial Aid at Baylor University. She is a resident and citizen of the State of Texas and of the United States.

4. Defendant is an institution of higher education chartered and existing under the law of the State of Texas. It receives federal financial assistance. Service of process has, by agreement, been delivered to its attorney of record, Julie Springer of WEISBART SPRINGER HAYS, LLP, 212 Lavaca Street, Suite 200, Austin, Texas 78701, who has filed a waiver of service of summons.

### C. Jurisdiction & Venue

5. The court has federal question jurisdiction of this case pursuant to 28 USC, §1331.

6. Venue is proper because all of the acts, omissions, and transactions made the basis of this suit occurred in the geographical confines of the Western District of Texas.

### D. Relevant Facts

7. Plaintiff was a relative newcomer to Baylor, hired on December 15, 2014. She had, however, served through two evaluation periods with high praise for her job performance from supervisor and hiring decision maker Bob Spence.[A, B] She, along with the rest of the Baylor community witnessed the embarrassing events involving alleged sexual harassment and assault perpetrated by members of the university football team, and leading to dismissal of Chancellor Kenneth Starr and football coach Art Briles.

8. Lyn Wheeler Kinyon represented Baylor on several professional committees and boards, including the Texas Higher Education Coordinating Board's (THECB) Financial Aid Advisory Committee, the Texas Association of Student Financial Aid Administrator's (TASFAA) Board of Directors, and the TASFAA Legislative Issues Committee, to name a few. Her office staff was happy to have her leadership and supported the job she was doing. Office morale was up. Staff turnover was down.

9. Plaintiff is well respected in the financial aid community, especially in Texas. In 2008 her colleagues inducted her into the TASFAA Hall of Fame for her life-long service to and leadership in the profession. There are only 27 financial aid professionals in the TASFAA Hall of Fame.

10. Plaintiff had many positive working relationships with Baylor colleagues outside the financial aid office including Information Technology, Financial Services, Internal Audit, and the Registrar's office. Additionally, and of considerable significance, the financial aid office had a totally clean audit for the 2015-16 academic year under her leadership. A clean audit is not something to be looked at lightly and not something accomplished by many financial aid offices.

11. Plaintiff was sucked into the vortex of Baylor's Title IX controversy when XX, a Baylor football player who had *not* committed sexual assault, was wrongfully accused of unspecified misconduct kicked off the football team, denied his scholarship, housing, and meal allowance. He was instantly rendered homeless, without food or money on the streets of Waco.

12. XX had, however, been involved in a consensual sexual relationship with a young woman, YY, on or about April 12, 2016. YY made no outcry against XX. In point of fact, YY traveled voluntarily to XX's apartment, went through two doors, and had consensual sexual relations with XX. Thereafter, she left XX's bed and commenced consensual sexual relations with

one of XX's roommates, ZZ. YY subsequently terminated her consensual sexual relations with ZZ, and entered a third bedroom in the apartment, where she spent the rest of the night with WW, a former boyfriend.

13. YY was, however, detained by authorities on May 5 2016 as a result of a mental health warrant. During the course of interviews incident to the May 5 detention, YY mentioned, on information and belief, her sexual experiences on the night of April 12, 2016.

14. On or about May 13, a representative of Baylor Regents informed Coach Briles that, in addition to the allegations of sexual assault by Baylor football players alleged to have occurred dating back to 2011, there might be an issue with certain transfer students more recently connected to sexual activity. On information and belief, Plaintiff alleges that the Regents' representative was referring to XX and his roommates, all members of the Baylor football team.

15. On or about May 19, 2016, an assistant Baylor football coach sent an authorization form to XX that would have allowed Baylor to access his academic and disciplinary records at the university he had attended before he had transferred to Baylor (FERPA waiver hereinafter). XX, who had returned to his home out of state after the end of his spring classes, did not respond to the request.

16. On or about May 25, 2016 the Baylor Police Department generated an offense report and commenced an investigation into YY's sexual activity on the night of April 12, 2016.

17. On May 26, 2016 Baylor football coach Art Briles was fired amid accusations that he had not properly handled or disciplined Baylor football players accused of illegal sexual assaults dating back to 2011. At or about the same time Baylor President and Chancellor Ken Starr, the former Special Prosecutor of President Bill Clinton, was fired amidst the same scandalous accusations that surrounded Coach Briles' dismissal.

18. On or about May 30, 2016 XX returned to the Baylor campus to commence his summer classes. Although he was a "full-ride" football scholarship student who had been enrolled at Baylor through the spring, 2016 semester, the athletic department informed him that he did not have housing, and that he should sleep on one of his teammates couches.

19. On May 31, 2016 Baylor Athletic Department officials informed XX of the Baylor Police Department Investigation into his sexual relationship with YY on April 12, 2016.

20. On June 1, 2016 Baylor Athletic Department official, Chad Jackson, asked XX to execute a FERPA waiver that would allow his former university to produce his academic and disciplinary records at that institution. XX complied with the request. On June 3 XX was removed from the football team by Coach Jim Grobe at the instruction of Baylor's administration.

21. On June 7, 2016, Baylor athletic official, Chad Jackson informed XX that he had been dismissed from the football team "[A]s a result of dialogue between university administrators relative to your conduct record."[C] Kristin Tucker gave XX formal notice of a Title IX complaint against him the same day.[D] On information and belief, Senior Vice President and Chief Operating Officer, Reagan Ramsower was the driving force in the actions taken against XX.

22. XX appealed the rescission of his football scholarship. His appeal was presented to a committee chaired by Plaintiff, Lyn Wheeler Kinyon. The committee convened to hear the appeal on July 1, 2016.

23. At the hearing, Baylor's representative dropped the allegation that XX had been involved in sexual activity as justification for rescission of the scholarship, although the allegation of sexual misconduct was the sole motivating factor for Baylor's actions against XX on May 30 and 31, 2016. Instead, Baylor changed its story, and attempted to justify termination of XX's

scholarship on the grounds that XX has been untruthful on his application for admission to Baylor the spring 2016 semester.

24. Baylor focused on XX's negative answer to a question, "Have you ever had any disciplinary action imposed against you?" XX had in fact been placed on academic probation at his previous university for his academic performance. Baylor took the position that XX had lied on his application for admission and was therefore unworthy of a Baylor football scholarship.

25. Baylor's application for admission form, however, defined disciplinary action as follows:

> "Disciplinary action includes any probation, suspension, removal, or expulsion as a result of any *academic or behavioral misconduct*." (emphasis added)[E]

Under Baylor's definition XX's academic probation at his previous university was not a disciplinary action because he had been placed on probation for substandard academic performance, not for academic or behavioral misconduct.

26. There is no evidence in the previous university's file that XX was on probation for cheating on tests, plagiarism, or any other form of academic misconduct. There is no evidence that XX was on probation, suspension, removal, or expulsion at his previous university for any form of behavioral misconduct. The only evidence relating to probation in the previous university's file delivered to Baylor on or after July 1, 2016 is that XX had been on probation for bad grades. Moreover, Baylor had been on notice of XX's academic probation for at least five months previous to June 1, 2016, having admitted him as a transfer student form the previous university for the spring semester of 2016. Incident to that transfer process, Baylor had complete access to XX's academic record at the previous university.

27. By insisting that XX's scholarship was terminated because of dishonesty in his original application for transfer, Baylor is hoist on its own petard because it had made the decision to terminate XX's scholarship, take away his meal ticket, and deny him housing on May 30, 2016, two days *before* it

obtained his file from the previous university, a file which indicated that he had been placed on academic probation.

28. Baylor apparently did not read its own definition of "Disciplinary Action," when it chose to rely on an alleged untruthful response on the application form as the sole ground to justify termination of the football scholarship at the financial aid appeal hearing. Thereafter, the appellate panel went into deliberation over the weekend.

29. Other appeal committee members; mindful of Baylor's penchant for knee-jerk reaction to events perceived to have harmed the brand, requested that their chair, Lyn Wheeler Kinyon seek written assurance from the university's Office of General Counsel that there would be no retaliation against any member of the committee, if the decision was in favor of the student. She did this through her email to Doug Welch, Associate General Counsel on July 3, 2016.[F]

30. Attorney Welch replied on July 5, 2016, stating:

"While there is no written policy of Baylor not to retaliate against persons who serve on committees, general policies regarding standards of personal conduct and the code of ethics would apply here to protect the individuals who serve in such roles."

31. On July 6, 2016 the appeal committee issued its recommendation that XX's scholarship be reinstated.[G] Attorney Welch's assurance to the contrary notwithstanding, retaliation against Lyn Wheeler Kinyon followed shortly thereafter.

32. XX was interviewed by the Baylor Title IX Office in July 15, 2016. The university continued to report its investigation into the Title IX complaint against XX until October 13, 2016, at which time he was informed that the complaint would be suspended, provided he agreed to never seek readmission to Baylor and to never reenter the Baylor campus. This action effectively prohibited XX from seeking admission to any Division I university, and ended his collegiate football career at the expiration of his junior college eligibility in 2016. It is also circumstantial evidence of Baylor's institutional pattern and practice of blind retaliation.

### E. Retaliation and Cover-up.

33. Earlier in the spring semester, Bob Spence, Plaintiff's hiring decision maker and supervisor announced his plan to retire effective July 29, 2016. Jennifer Carron, Associate Vice President for Enrollment Management, became Plaintiff's new supervisor in a reorganization that involved transfer of the Student Financial Aid Office from the Financial Services Division to the Undergraduate Admissions office. Jennifer Carron is believed to be a Reagan Ramsower protectorate and protégé. She is alleged to be the implement of Baylor's and Ramsower's retaliation against Plaintiff.

34. This new supervisor did not have any experience in financial aid, and did not know what Lyn Wheeler Kinyon did on a daily basis - at all. Her entire criticisms of Plaintiff, which formed the sole basis of her termination, were from observations at meetings where she was in attendance. Of her own admission, Jennifer Carron never heard anything negative about Lyn Wheeler Kinyon from any her staff.

35. On July 1, 2016, Jennifer Carron emailed Plaintiff asking about the XX Title IX hearing. Lyn Wheeler Kinyon replied that the committee was still in deliberations.[H] During the period July 7 through September 7, 2016 Jennifer Carron scheduled a total of 5 one-on-one meetings with Plaintiff. Three of those meetings were cancelled.

36. In a meeting on September 9, 2016 Jennifer Carron, who is significantly younger than Lyn Wheeler Kinyon, asked cryptically if Plaintiff thought she was meeting her (Jennifer Carron's) expectations. She presented Plaintiff with a grid document entitled Admissions Services Core Competencies, and asked her to look it over. Carron criticized Plaintiff for lack of meaningful communication in meetings. She told Plaintiff she did not meet her expectations at the Assistant

Vice President or Director levels, but gave no specifics other than extremely subjective criticisms regarding matters of style, rather than substance.

37. A week later, on September 16, 2016 Jennifer Carron met Lyn Wheeler Kinyon in her office for leadership training in the Student Financial Aid Office. She repeated that Lyn Wheeler Kinyon did not meet her expectations, this time giving examples of meetings when Kinyon's style of participation was not as assertive as Carron would have liked.

38. On September 21, 2016 Jennifer Carron sent an email to Plaintiff demonstrating a penchant for micromanagement of a project involving a post card mail-out to students, as well as any future conversations Lyn Wheeler Kinyon had about financial aid communications, email templates, email content, print communication pieces, and online communications. She also insisted that she be involved in all interviews of candidates for a new operations position in the Student Financial Aid office. Carron also *apologized for not being prepared to discuss the post card project the week before*.[I]

39. On September 26, Lyn Wheeler Kinyon wrote a two-page email apologizing for misunderstanding some of Jennifer Carron's suggestions, especially her desire to be involved in all new employment interviews. She expressly acknowledged Carron's anticipated involvement in interviews of the final four candidates.[J]

40. On September 27, 2016 Jennifer Carron sent a long email addressing mass emails, an award booklet, and repeating her chagrin at not being involved in the interview process; Kinyon's apology and acknowledgement of that *fax paus* the day before apparently being insufficient to soothe Carron's pique.[K]

41. On September 29, 2016 a meeting with Jennifer Carron for "FA training/leading the SFAO," originally scheduled for Lyn Wheeler Kinyon's office, was changed at the last minute

to Carron's office. A representative of the Human Resources office was present, and a 30-day Performance Improvement Plan (PIP) was presented to Plaintiff. She was told to adapt to change, demonstrate leadership in the transformation to Enrollment Management, and reduce student debt. Her one-on-one meetings were found to be lacking in strategizing for cooperative work to lead Financial Aid. She was criticized for lack of meaningful contributions to meetings she had been invited to attend, and for being *unprepared* for meetings. She was encouraged to reach out for and to identify opportunities for collaboration. Lyn Wheeler Kinyon dutifully signed and returned the PIP form on October 1, 2016.[L]

42. On September 30, 2016 Jennifer Carron sent an email reinforcing a voicemail message for Kinyon to put a hold on the operations position interview. She suggested a fabricated story for Kinyon to tell her team members about why the interviews were being postponed.[M]

43. On October 4, 2016 Plaintiff had her first PIP meeting with Jennifer Carron. She asked how she would be evaluated during the PIP. Carron replied that the evaluation would be "a little different than most PIPs" because the required improvements were difficult to measure (read subjective), and that they would "figure it out" as they went.

44. On October 12, 2016 Kinyon and Carron had a second week PIP meeting. Kinyon was praised in being prepared for a meeting during the week and pursuing excellence by adjusting to change. She was told to be even better prepared for meetings, to adapt an interpersonal style to meaningfully interact with others, take responsibility for fostering relationships, and to work with others toward a common goal maintaining cooperative work relationships. She was specifically criticized for not setting the tone in opening the communications meeting, and for not summarizing the results or action items agreed upon.[N]

45. On October 25, 2016 Jennifer Carron informed Lyn Wheeler Kinyon that the 30-day PIP was ending on day 26; that she was proceeding with her termination. She stated that the gap between her expectations and Kinyon's performance was too wide to be spanned.

46. In a word, Jennifer Carron was determined to be dissatisfied with Lyn Wheeler Kinyon's job performance, regardless of her actual improvements and overall history of high performance levels at Baylor. This is a quintessential characteristic of pretext.

47. Carron suggested that Kinyon, who is 58 years old, could consider retiring. This is a quintessential characteristic of age discrimination.

48. In an exit interview on November 2, 2016 Casidy Wegwerth of Baylor's Human Resources office told Lyn Wheeler Kinyon that if she resigned by the end of November and signed an agreement releasing all claims against the university, she would remain on the payroll through the end of December, and be paid her earned but unused and unpaid vacation leave benefit, and that her status in HR would be "eligible for rehire." Wegwerth warned that if Kinyon did not resign by the end of November she would be terminated, would not receive a severance package, would be escorted out of the building, and that her status with HR, if contacted by a prospective employer, would be "*not* eligible for rehire." In a word, Baylor attempted to intimidate and coerce Plaintiff into executing a release for illusory or no consideration.

49. Baylor subsequently paid Plaintiff's unused vacation benefit without requiring her to execute a release of claims, thereby proving that the unused vacation pay was earned by her pervious performance, and that any attempt to characterize the vacation benefit as consideration for a release of claims would have been illusory. Illusory consideration is a quintessential characteristic of an unenforceable contract.

## F. Legal Principles

50. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX "is enforceable through an implied private right of action . . . for monetary damages as well as injunctive relief." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994). "It is equally well established 'that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 367 (S.D.N.Y. 2015). At the time Baylor terminated XX's football scholarship, his gender and alleged sexual activity with YY were the actual motivating factors. Therefore, XX was, on the basis of sex, excluded from participation in, denied the benefits of, and subjected to discrimination under an education program or activity receiving Federal financial assistance.

51. Lyn Wheeler Kinyon's reversal of Baylor's decision to terminate XX's football scholarship is protected under Title IX of the Education Amendments of 1972, 20 U.S.C., §1681 because it constitutes opposition to Baylor's discrimination against XX on the basis of sex. *Doe v. Brown University* (C.A. No. 15-144 S, slip opinion at 24-5, D.R.I. 2016); *Doe v. Columbia University*, 191 F.Supp.3d 356, 367 (S.D.N.Y. 2015); and *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir.1994).

52. The implied private right of action in Title IX has been found by the Supreme Court to include retaliation. It is liberally construed. See *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 176-77 (2005).

53. Lyn Wheeler Kinyon was an excellent financial aid administrator who earned high praise from her hiring supervisor Bob Spence and her colleagues in the profession. It was only

after she made Reagan Ramsower angry by reinstating XX's scholarship that she allegedly became incompetent. And though Jennifer Carron was anything if not persistent in her criticisms, they were consistently vague, general, non-specific, and highly subjective.

54. Carron's criticisms of Kinyon's job performance, made to pretextually justify the termination, are unworthy of credence. Proof that the defendant's explanation is unworthy of credence is a form of circumstantial evidence that is probative of intentional discrimination. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 147 (2000).

### G. Remedies and Damages

55. Lyn Wheeler Kinyon was working for Baylor at an annual salary of $107,530. At 58 years of age, she enjoyed a work life expectancy of at least 8 years. Fortunately, she has been able to mitigate her damages by obtaining employment with a state university at a salary of $70,000 per year.

56. Baylor's action in terminating Lyn Wheeler Kinyon's employment for false and pretextual reasons made her physically ill. She became depressed, tearful, and anxious. She hyperventilated, had trouble sleeping, and digesting her food.

57. She has and will continue to suffer physical pain, mental anguish, and emotional distress of sufficient severity and duration as to alter the daily routine of her life for an indefinite time in the future as a result of Baylor's retaliation against her.

58. Baylor has acted with malice for Plaintiff, which in the terms of Chapter 41, Texas CIVIL PRACTICE & REMEDIES CODE means it had a specific intent to cause substantial injury or harm to Lyn Wheeler Kinyon. Such malice was a direct, proximate, and producing cause of Plaintiff's damages. The malice is exemplified by Carron's unremitting series of job performance criticisms, which she knew were unfounded, and which she orchestrated to create a false and

pretextual justification for the termination she was planning at Reagan Ramsower's direction. The attempt to coerce and intimidate Kinyon, who was not at the time represented by legal counsel, into signing a general release for illusory consideration is also malicious.

59. At the time of its retaliation against Lyn Wheeler Kinyon, Baylor's conduct did, when viewed objectively from the standpoint of the actor at the time of its occurrence, involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which Baylor had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, notably Lyn Wheeler Kinyon. Specifically, Baylor knew that its termination action against the 58-year old Kinyon presented an extremer risk of ruining the rest of her professional life. Accordingly, Baylor was grossly negligent in its dealings with Lyn Wheeler Kinyon, and such gross negligence was a direct, proximate, and producing cause of her damages.

60. Plaintiff sues to recover her actual damages in amounts to be found by the jury for
    a. Lost wages in the past;
    b. Injury to future earning capacity;
    c. Physical pain, mental anguish, and emotional distress in the past;
    d. Physical pain, mental anguish, and emotional distress, which in reasonable probability she will suffer in the future.
    e. Past and future medical expenses.

61. Plaintiff sues to recover an award of exemplary damages in an amount to be set by the jury.

## H. Jury Demand

62. Plaintiff demands a trial by jury.

## I. Prayer

63. Premises considered, Plaintiff prays that Defendant be cited to appear and answer herein in the terms of the law; that upon final hearing and jury trial she have judgment of and from the defendant for the full amount of her actual and exemplary damages; that she recover her costs incurred herein; that she recover pre-judgment and post-judgment interest as allowed by law; and for such other and further relief as the Court may deem proper.

    Respectfully submitted,



The Commissioners House at Heritage Square
2901 Bee Cave Road, Box L
Austin, Texas 78746
Telephone:512/328-9099
Facsimile: 512/328-4132
Email: jjudge@jkplaw.com

By: _____
    John Judge
    State Bar No. 11044500

**ATTORNEY FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of February 2017, a true and correct copy was served upon:

Julie A. Springer
Weisbart Springer Hayes LLP
212 Lavaca, Suite 200
Austin, Texas 78701
Telephone: (512) 652-5782
Email: jspringer@wshllp.com


John Judge

## APPENDIX OF EXHIBITS

[A] Performance evaluation, May 20, 2015
[B] Performance evaluation, May 25, 2016
[C] Chad Jackson email to XX, Jim B. Grobe, Phil G. Bennett, Jim Gush, and Chris Achuff.
[D] Kristin Tucker, June 7, 2016 letter to XX
[E] Definition page from Baylor Application for Admission form
[F] Kinyon to Welch email, July 3, 2016, 10:36 a.m.
[G] Kinyon email to Faulk, July 6, 2016
[H] Carron-Kinyon email chain, July 1, 2016
[I] Carron to Kinyon email, September 21, 2016, 9:51 a.m.
[J] Kinyon to Carron email, September 26, 2016 7:51 a.m.
[K] Carron to Kinyon email, September 27, 2016 11:52 a.m.
[L] Carron to Kinyon performance improvement plan, September 29, 2016
[M] Carron to Kinyon email, September 30, 2016 9:46 a.m.
[N] Carron to Kinyon email, October 12, 2016